Kari J. **MANDY**, Plaintiff,

v.

**QUAD/GRAPHICS, INC.,** Defendant.

No. 97–C–961.

United States District Court,
E.D. Wisconsin.

June 11, 1999.

---

Thomas G. Halloran, The Schroeder Group, Waukesha, WI, for plaintiff.

Thomas W. Scrivner, Michael, Best & Friedrich, Milwaukee, WI, Robin M. Sheridan, Quad/Graphics Inc., Corporate Counsel–Employee Service, Sussex, WI, for defendant.

### DECISION AND ORDER

RANDA, District Judge.

This matter comes before the Court on defendant's motion for summary judgment. For the following reasons, the motion is granted and the case dismissed.

### I

Quad/Graphics, Inc. ("Quad" or "the Company") prints magazines, catalogs, and free-standing inserts. (Defendant's Proposed Findings of Fact ("DFOF") at ¶ 1; Plaintiff's Response to Defendant's Proposed Findings of Fact ("PR") at ¶ 1.) Quad has printing plants in Pewaukee, Sussex, Hartford, Lomira, West Allis and New Berlin, Wisconsin, as well as out-of-state plants in Thomaston, Georgia, Martinsburg, West Virginia, and Saratoga Springs, New York. (Id.) Quad has had a formal sexual harassment policy in effect since 1986. (DFOF at ¶ 3; PR at ¶ 3.) At all relevant times, that policy was contained in the Company's employee manual and read as follows:

> Quad/Graphics will not tolerate the harassment of its employees;
>
> \*   \*   \*   \*   \*   \*
>
> Quad/Graphics prohibits any form of harassment by employees, co-workers and supervisors, and views such action very seriously. Harassment or other unacceptable activities that could become a condition of employment or a basis for personnel decisions, or which create a hostile environment are specifically prohibited. Any employee who engages in such harassment is subject to immediate discipline, up to and including discharge.
>
> \*   \*   \*   \*   \*   \*
>
> Sexual harassment means unwelcome sexual advances, unwelcome physical conduct of a sexual nature or unwelcome verbal or physical conduct of a sexual

nature. Sexual harassment also includes implicitly or explicitly making or permitting the submission to sexual harassment a term or condition of employment or any part of the basis for any employment decisions affecting an employee.

> ● Harassment can occur as a result of a single incident or a pattern of behavior where the purpose or effect of the incident or behavior is to create a hostile, offensive or intimidating work environment. Harassment encompasses a broad range of physical, verbal and visual behavior which can include, but is not limited to, the following:
>
> ● Physical or mental abuse
>
> ● Unwelcome sexual advances or touching
>
> ● Sexual comments or sexual jokes
>
> ● Requests for sexual favors used as a condition of employment or affecting any personal [sic] decision such as hiring, promotion, or compensation.

(DFOF at ¶¶ 3–5; PR at ¶¶ 3–5.) Quad's policy also informed employees that they should report incidents of harassment immediately, that any such reports would be investigated promptly and that no retaliation would be taken or condoned:

> ● An employee's position or opportunities for advancement will not be jeopardized as a result of alerting management about a potential sexual harassment charge. Retaliation will not be condoned. All reported cases will be handled confidentially.
>
> ● Any employee who believes that he or she has been the subject of prohibited harassment should report the matter immediately to his or her Supervisor or the Director of Employee Services. Any such reports will be investigated promptly.

(DFOF at ¶ 6; PR at ¶ 6.)

In March, 1993, Kari Mandy ("Mandy") began working at Quad's Sussex plant as a temporary employee in the Finishing Department. (DFOF at ¶ 2; PR at ¶ 2;

Plaintiff's Proposed Findings of Fact at ¶ 4; Defendant's Response to Plaintiff's Proposed Findings of Fact ("DR") at ¶ 4.) Quad hired Mandy as a regular employee in the Finishing Department shortly thereafter. (Id.) Mandy received a copy of the above-referenced employee manual after beginning her employment with Quad. (DFOF at ¶ 3; PR at ¶ 3.) She was told to read the manual, which she did. (DFOF at ¶ 7; PR at ¶ 7.) She knew the manual contained a procedure for addressing sexual harassment issues. (DFOF at ¶ 8; PR at ¶ 8.) She knew she had a duty to report such harassment as soon as she believed it was occurring. (Id.) She knew that, if necessary, she could bypass her supervisor and report the harassment to someone else, including her supervisor's boss, the Director of Employee Services, or even to Harry Quadracci himself, the owner and founder of the Company. (Id.) She also knew that the Company would investigate any allegation of sexual harassment. (Id.)

In September, 1993, Mandy met Vince Koeppel ("Koeppel"), who had supervisory responsibility for a unit within the Finishing Department named "Cover Concepts." (PFOF at ¶ 5; DR at ¶ 5; DFOF at ¶ 2; PR at ¶ 2.) It seems that Koeppel was a difficult person to work with. (Nash Aff. at ¶ 4.) One employee, Ron Nash ("Nash"), who worked with Koeppel at the Sussex facility from 1988 until January, 1995, described Koeppel as having "an arrogant attitude and a mistaken notion he was more important than he was." (Id. at ¶¶ 4–5; DFOF at ¶ 68; PR at ¶ 68.) Nash claims Koeppel "enjoyed trying to intimidate and coerce peers and co-workers, [Nash] included, into doing what he wanted." (Id.) As Nash saw things, Koeppel's tactics were directed at men and women; indeed, Nash saw Koeppel use these tactics with men more than with women, though he clearly used them with both. (Id.) Nash felt that Koeppel did these things to look important, to make it appear that he was in control, and to make his co-employees feel as though they should do what he wanted. (Id.) Whether or not Mandy discerned this aspect of Koeppel's

personality prior to working for him is unknown. In any event, shortly after meeting Mandy, Koeppel asked her if she wanted to supervise a small area in the Cover Concepts unit of the Finishing Department. (PFOF at ¶ 6; DR at ¶ 6; DFOF at ¶ 2; PR at ¶ 2.) Mandy accepted the position and began working in Cover Concepts—under Koeppel's supervision—in November, 1993.(Id.)

As alleged, it was not long before Koeppel began mistreating Mandy. Beginning the following month, Koeppel harassed Mandy both within and without the workplace. The alleged harassment took various forms, some of which were consistent with Nash's allegations of Koeppel's treatment of employees generally, and some of which involved conduct that was overtly sexual or which seemed to be targeted at Mandy because she was a woman. For instance, in December, 1993, Koeppel sat in close proximity to Mandy and asked why she had brown eyebrows and blonde hair. (PFOF at ¶ 7; DR at ¶ 7.) During this same time period he told Mandy that she was sexy and attractive. (Id.) He repeated such statements on a number of occasions throughout 1994 and 1995.(Id.) On at least one occasion Koeppel told Mandy that she was lucky to have the job she had and reminded her that he was the one responsible for getting her that job. (PFOF at ¶ 8; DR at ¶ 8.) Koeppel said this while sitting very close to Mandy, with his leg touching hers in a way that she interpreted as sexual. (PFOF at ¶ 9; DR at ¶ 9; Mandy Dep. at 90–96.) Koeppel made such physical contact with Mandy on several occasions, including at least one incident where he rubbed Mandy's leg with his hand. (Id.) Mandy consistently told Koeppel that such contact bothered her and that he should back away. (Id.) At times, when Koeppel needed to move past Mandy, he would place his hands on her waist to move her, and often would pull her against his body in the process. (PFOF at ¶ 27; DR at ¶ 27.)

On a number of occasions Koeppel threatened to fire Mandy or send her back to her old job in the Finishing Department if she failed to perform various aspects of her job. (PFOF at ¶ 10; DR at ¶ 10; Mandy Dep. at 119–121.) Koeppel allegedly made similar threats, however, in contexts having little to do with Mandy's job performance. For instance, during the Summer of 1994, Mandy remarked to a co-worker how nice it would be to have a drink after work. (PFOF at ¶ 11; DR at ¶ 11.) The following day Koeppel called Mandy from his car phone during Mandy's shift and told her to meet him at his car in Quad's parking lot. (Id.) Mandy refused but Koeppel insisted, telling Mandy she needed to do as he ordered because he was her boss. (Id.) Mandy relented. (Id.) Upon meeting Koeppel, he gave her a bottle of vodka. (Id.) When she told him that she did not want the bottle, he ordered her to put it away before someone saw her with it. (Id.) On another occasion during the Summer of 1995, Koeppel called Mandy at home and said that he was coming over with a gift for her son. (PFOF at ¶ 13; DR at ¶ 13; Mandy Dep. at 121–132.) Despite Mandy's insistence that he not do so, Koeppel arrived and simply walked into Mandy's house. (Id.) When Mandy told Koeppel that he should not have come to her home, Koeppel allegedly replied, "I do what I want to do." (Id.) Koeppel gave Mandy's son a gift, asked for a beverage and made small talk. (Mandy Dep. at 121–132.) After roughly twenty minutes, Koeppel got up to leave and commented to Mandy's mother—who was also present—that it was a good thing her daughter let him in the house because she would not have a job otherwise. (PFOF at ¶ 13; DR at ¶ 13; Mandy Dep. at 121–132.)

Koeppel allegedly called Mandy at home on four or five occasions during 1994 and 1995. (PFOF at ¶ 12; DR at ¶ 12.) None of these calls dealt with work-related issues. (Id.) On one such occasion, Koeppel called Mandy after 11:00 p.m. (PFOF at ¶ 14; DR at ¶ 14.) When Mandy objected to his calling at such an hour, Koeppel told her that he had every right as her supervi-sor to call her at home. (Id.) On another particularly grievous occasion, Koeppel called Mandy and allegedly told her that he was thinking about her and masturbat-ing. (PFOF at ¶ 12; DR at ¶ 12.)

Koeppel arrived unannounced and unin-vited at Mandy's home on several occa-sions. (PFOF at ¶ 15; DR at ¶ 15.) For instance, in 1994, after Mandy had under-gone surgery, Koeppel brought two dozen roses to her home, which Mandy interpret-ed as a sexual advance. (Id.) Koeppel visited Mandy's home and entered the same on at least two other occasions in 1994.(Id.) On other occasions, Koeppel seemingly maintained some form of sur-veillance over Mandy's house. That is, Mandy claims Koeppel told her in 1995 that he had been at her house watching her boyfriend pack up his truck. (PFOF at ¶ 16; DR at ¶ 16.) On other occasions Koeppel made additional comments to Mandy indicating that he had been watch-ing her and her son. (Id.) Such comments allegedly increased during the Spring and Summer of 1995.(Id.)

Koeppel allegedly invited Mandy to sev-eral private "Think Smalls." (PFOF at ¶ 17; DR at ¶ 17.) "Think Small" is a Quad term for a get-together between Company employees who work in the same department. (Id.) Such gatherings are in-tended to give employees a chance to relax together, have drinks and dinner, and dis-cuss work-related issues. (Id.) Koeppel's invitations to Mandy, however, were sexual in nature, coupled with statements that they would be alone, that he would provide the steaks and that she would provide "everything else." (Id.) Moreover, these statements were allegedly made around the time that Mandy was due for a raise. (Id.) The last of these invitations allegedly occurred in late-April or early-May, 1995.(Id.)

In June, 1995, Mandy drove with Koep-pel to a business meeting in Chicago. (PFOF at ¶ 19; DR at ¶ 19.) Mandy agreed to travel with Koeppel only after other female co-workers also agreed to

travel with them. (Mandy Aff. at ¶ 6.) Upon passing various adult book stores along the highway, Koeppel began discussing the details of such establishments and/or the adult movies or videos available there. (PFOF at ¶ 19; DR at ¶ 19; Scott Dep. at 31–32; Mandy Aff. at ¶ 6.) Mandy and her fellow passengers were uncomfortable with the conversation and one of them asked Koeppel to change the topic, but he persisted. (Id; PFOF at ¶ 20; DR at ¶ 20.)

In late–1995, Koeppel told Mandy that he wanted her to hire his son. (PFOF at ¶ 21; DR at ¶ 21.) Mandy explained that this would violate Quad policy and that she wanted to discuss the matter with Steve Kirk ("Kirk"), the manager of Quad's Finishing Department in Sussex. (Id.) Koeppel warned Mandy not to threaten him and said he could make her life hell. (Id.) Shortly thereafter, Koeppel sent Mandy an e-mail containing XXs' and OO's (i.e., hugs and kisses) in the subject heading or after his name, something he did regularly beginning in 1994. (PFOF at ¶ 22; DR at ¶ 22; Mandy Aff., Ex. 2.) And regardless of the various threats of termination and disciplinary action which Koeppel made to Mandy over the course of their working relationship, it is undisputed that Koeppel never carried out any of these threats. (DFOF at ¶ 47; PR at ¶ 47.) To the contrary, Koeppel promoted Mandy to the Lead Position in Cover Concepts, a prestigious job resulting in a subsequent raise. (Id.) In fact, Mandy received numerous raises while working for Koeppel. (Id.)

Despite the ongoing pattern of harassment, described supra, Mandy did not report Koeppel's actions to Quad officials until November 13, 1995, almost two years after the harassment began. (DFOF at ¶ 10; PR at ¶ 10.) She initially reported the harassment to Renee Myers ("Myers") and Linnea Koenigs ("Koenigs"), two of Quad's Career Assistance Representatives. (Id.) Myers and Koenigs immediately called Peggy Haggerty ("Haggerty") to join the meeting. (DFOF at ¶ 11; PR at ¶ 11.) At the time, Haggerty was a staff attorney working out of Quad's Sussex facility. (Id.) After hearing several of Mandy's allegations, Haggerty stopped the meeting to confer with Emmy LaBode ("LaBode"), the Director of Employee Services. (DFOF at ¶ 12; PR at ¶ 12.) After hearing of Mandy's allegations, LaBode asked Haggerty to bring Mandy to LaBode's office.(Id.) Once there, Mandy met with LaBode and Kirk and told them that she had been the victim of various forms of sexual harassment perpetrated by Vince Koeppel for one and half years. (DFOF at ¶¶ 12–13; PR at ¶¶ 12–13.) Mandy reported mental harassment consisting of Koeppel's constant threats that he would fire Mandy if she did not do something that he wanted her to do (although none of the threats were made in the context of a request or demand for sexual favors). (DFOF at ¶ 14; PR at ¶ 14; PFOF at ¶ 26; DR at ¶ 26.) Mandy reported physical harassment consisting of Koeppel's tendency to place his hands on Mandy's waist to move her out of the way and, in the process, pulling her body against his. (DFOF at ¶ 15; PR at ¶ 15; PFOF at ¶ 27; DR at ¶ 27.) Mandy reported verbal harassment including Koeppel's phone calls to her home concerning non-work related topics (including the call during which Koeppel indicated he was masturbating), forcing her to accept money and gifts (including gifts to her son), his comments regarding pornography while traveling to Chicago, his use of XX's and OO's in e-mails, and his invitations to private "Think Smalls" with the corresponding implication that something sexual would occur. (DFOF at ¶ 16; PR at ¶ 16; PFOF at ¶ 28; DR at ¶ 28.) Haggerty asked Mandy during the meeting what it would take for her to feel safe in the workplace (assuming, for the sake of argument, that Mandy's allegations were true). (Haggerty Dep. at 27.) Mandy said she did not want Koeppel to get into trouble or lose his job, and may have said that she did not want Koeppel disciplined at all. (DFOF at ¶ 17; PR at ¶ 17; PFOF at ¶ 31; DR at ¶ 31; Haggerty Dep. at 27; LaBode Dep. at 47; Mandy Dep. at 53–55.) Mandy also

said that she wanted to be left alone to perform her job in peace, that she wanted Koeppel's harassment to cease, and that she did not want to worry about the possibility of being fired by Koeppel. (PFOF at ¶ 31; DR at ¶ 31; Haggerty Dep. at 27.) Mandy was told that an immediate investigation would take place. (DFOF at ¶ 18; PR at ¶ 18.) Quad placed Mandy on paid leave for roughly seven (7) working days while the investigation was completed. (DFOF at ¶ 18; PR at ¶ 18.)

That same day, LaBode, Kirk and Haggerty confronted Koeppel with Mandy's allegations. (DFOF at ¶ 19; PR at ¶ 19.) Koeppel admitted that some of the allegations were true (though misunderstood), and denied others. For instance, Koeppel admitted to making remarks concerning Mandy's perilous job security, but claimed they were only in jest. (DFOF at ¶ 20; PR at ¶ 20.) He admitted going to Mandy's house, but denied that he did so against her wishes. (DFOF at ¶ 21; PR at ¶ 21.) He admitted calling Mandy at home, but claimed all such calls were work-related. (Id.) He admitted giving Mandy money at Christmas but claimed he shared his Christmas bonus with several employees, although he was unable to name any such employee other than Mandy. (DFOF at ¶ 22; PR at ¶ 22.) He admitted loaning money to Mandy and giving gifts to her son, but claimed he did so only as a friend and to help her out financially. (Id.) He admitted placing XX's and OO's in e-mails to Mandy at work, but claimed it was just a sign of friendship and that he had sent such e-mails to other employees as well. (DFOF at ¶ 23; PR at ¶ 23.) Again, Koeppel was unable to name any such employee other than Mandy. (Id.) He admitted making references to the adult video stores they passed during the trip to Chicago, but said he never perceived these references as unwelcome or offensive. (DFOF at ¶ 25; PR at ¶ 25.) Koeppel flatly denied any intentional physical contact with Mandy, but later admitted that he may have inadvertently bumped into Mandy on occasion as a result of being blind in one eye. (DFOF at ¶ 26; PR at

¶ 26; PFOF at 138; DR at ¶ 38.) He denied calling Mandy and to tell her he was masturbating. (DFOF at ¶ 26; PR at ¶ 26.) And he denied inviting Mandy to private "Think Small's." (Id.) At the end of this meeting, Koeppel was ordered not to have any further contact with Mandy. (DFOF at ¶ 27; PR at ¶ 27.)

Haggerty proceeded with a full investigation, which took place over the next few days. (DFOF at ¶ 28; PR at ¶ 28.) She met with Mandy and Koeppel for follow-up interviews. (Id.) She interviewed Mandy's mother concerning one of Koeppel's visits to Mandy's home. (Id.) She also interviewed Julie Scott and Laura Hellman, the two women who accompanied Mandy and Koeppel on the drive to Chicago. (Id.) Within days, Haggerty prepared a report of her investigation and concluded therein that Koeppel sexually harassed Mandy. (DFOF at ¶ 30; PR at ¶ 30.) Haggerty forwarded the report to LaBode, who agreed with Haggerty's conclusion. (DFOF at ¶ 31; PR at ¶ 31.) Haggerty also forwarded a copy of the report to Mandy, who read the report and admits that it accurately documents the conduct she reported to the Company in November, 1995. (DFOF at ¶ 32; PR at 32.) Haggerty's report recommended, among other things, that Koeppel no longer work out of the Sussex facility. (Piefer Aff., Ex. A at 5.) This recommendation reflected Haggerty's belief that Koeppel should not have any further contact with Mandy and that transferring Koeppel out of the Sussex facility "would be one way of ensuring it." (Haggerty Dep. at 50–51.) Haggerty further explained that, while the Sussex facility is huge, certain operations take place in certain plants, and it would be "kind of hard to remove somebody from a certain operation" without removing them from the facility altogether. (Id.)

On November 21, 1995—eight (8) days after Mandy first reported her allegations of sexual harassment—Frank Arndorfer, Quad's Vice President of Finishing, met with Mandy and Koeppel to inform each of

them of the actions Quad would take to address the situation. (DFOF at ¶¶ 33, 37; PR at ¶¶ 33, 37.) Mandy claims she echoed Haggerty's recommendations during this meeting and expressed her desire that Koeppel be removed from the Sussex facility. (PFOF at ¶ 42; DR at ¶ 42.) She further claims that Arndorfer told her that Koeppel would not be moved out of Sussex. (Id.) Arndorfer remembers the conversation somewhat differently. Arndorfer admits that he and Mandy discussed Koeppel's possible transfer, but that Mandy eventually said she would be satisfied if she and Koeppel were separated within the Sussex facility, had no substantial dealings with each other, and the harassment stopped. (Arndorfer Aff. at ¶ 3.)

In any event, there is no dispute as to the discipline Quad imposed on Koeppel as a result of his conduct towards Mandy and the measures it took to prevent further harassment by Koeppel:

- Arndorfer angrily told Koeppel that his conduct had been wholly unacceptable;
- Arndorfer reiterated that Koeppel was not to have any further contact with Mandy and that any further incidents would lead to dismissal;
- Arndorfer instructed Koeppel not to do or say anything that could be viewed as hostile or retaliatory towards Mandy;
- Arndorfer stripped Koeppel of his managerial responsibility for the Cover Concepts unit where Mandy worked;
- Arndorfer stripped Koeppel of his supervisory responsibility over any other employees in the Sussex facility;
- Arndorfer "moved" Koeppel's work area to a different building in the Sus-

sex plant which was 200 to 300 yards away from Mandy's work area;[1]

- Arndorfer warned Koeppel that his status as a manager was in jeopardy and that his compensation would be determined over the next several months;
- Arndorfer froze Koeppel's pay and, in Spring of 1996, denied Koeppel a merit wage increase; and
- Arndorfer reduced Koeppel's 1996 bonus.

(DFOF at ¶¶ 33–34; PR at ¶¶ 33–34.) It is undisputed that stripping a manager of supervisory authority over other employees is one of the harshest forms of discipline a manager can receive. (DFOF at ¶ 35; PR at ¶ 35.)

After the foregoing actions were taken, it is undisputed that the harassment which Mandy complained of ended. That is, Koeppel never visited Mandy's house again, either announced or unannounced. (DFOF at ¶ 39; PR at ¶ 39.) He never threatened Mandy with termination.(Id.) In fact, Koeppel and Mandy never spoke to each other again after she reported Koeppel's harassment. (Id.) Mandy never had to attend a single meeting at which Koeppel was present. (Id.) Mandy and Koeppel never rode in a car together. (Id.) Koeppel never invited Mandy to another "Think Small." (Id.) Koeppel and Mandy had no contact outside of work whatsoever. (Id.) And there is no allegation that Koeppel ever physically touched Mandy again, ever telephoned her at home, or ever made another sexually suggestive comment to Mandy once she reported his conduct to Company officials.

1. "Moved" is perhaps an inaccurate word to describe the actions taken in this regard. Prior to Mandy's charges Koeppel had his main work desk in Building 9, but he had supervisory responsibility over the Cover Concepts unit, which was located in Building 6, where Mandy's work station was located. (Scott Dep. at 132; PFOF at ¶ 47; DR at ¶ 47; Defendant's Reply Brief at 5, n. 4.) Koeppel's supervisory responsibility for Cover Concepts meant that, although he had a desk in Building 9, he frequently performed his work duties in Building 6.(Id.) After Koeppel was stripped of his supervisory responsibility over Cover Concepts, he maintained his desk in Building 9, but now had little reason to be in Building 6.(Id.) In this sense it may be said that Koeppel was "moved" out of Building 6.

Nevertheless, Mandy's job still required her to move from area to area within the Sussex facility with some regularity and required her to pass by Koeppel's work station in Building 9, perhaps several times a day. (PFOF at ¶ 48; DR at ¶ 48; Scott Dep. at 132–134; Mandy Aff. at ¶ 16.) She was not comfortable doing so and claims she expressed her discomfort to Haggerty. (Mandy Aff. at ¶ 20.) She also claims she told Haggerty and Kirk that Koeppel would come into Building 6 and interrupt discussions she was having with other employees (apparently in an effort to speak with the other employee, not with Mandy herself). (Id.) Haggerty allegedly told Mandy that she would report these concerns to Arndorfer and LaBode. (Id.)

In January, 1996, upset over the fact that Koeppel had not been transferred out of the Sussex facility, Mandy told Kirk she wanted a transfer to the Distribution Department, where she would not have to deal with Koeppel. (Mandy Aff. at ¶ 22; DFOF at ¶ 40; PR at ¶ 40.) Shortly thereafter, Mandy informed LaBode of her desire for a transfer, and a meeting was subsequently held between Mandy, Arndorfer, Kirk and LaBode on January 17, 1996. (Mandy Aff. at ¶ 23; DFOF at ¶ 41; PR at ¶ 41.) Mandy also brought Laura Hellman with her, who was apparently the head of the Distribution Department.(Id.) Mandy stated that she wanted to transfer to Hellman's department and that Hellman had created a position for Mandy. (Id.) Mandy said that she could not keep working in the Finishing Department because Koeppel would occasionally be in her building and would intentionally walk down aisles that she was in. (Id.) Mandy also complained that, on three or four occasions, Koeppel had intentionally interrupted conversations she was having with other people. (Id; Mandy Aff. at ¶ 20.)

Mandy stated that she needed to transfer to a department where she would never see Koeppel again. (Id.)

During this meeting, Arndorfer stated that Mandy could transfer if she wished, but reiterated his opposition to transferring Koeppel out of the Sussex facility. (LaBode Dep. at 31.) The discussion became heated, with Mandy stating that she felt she was being forced to work in a hostile environment, and LaBode asked Mandy and Hellman to leave the room for a moment.. (Id. at 31–32; PFOF at ¶ 53; DR at ¶ 53.) After Mandy and Hellman left the room, LaBode expressed her opinion that it was in Mandy's best interest that Koeppel be transferred out of the Sussex facility. (LaBode Dep. at 32.) After a long discussion, Arndorfer relented and agreed to transfer Koeppel. (Id.) Mandy was called back into the meeting and was informed of the decision to transfer Koeppel. (DFOF at ¶ 42; PR at ¶ 42.) Koeppel was transferred to the Pewaukee facility within a day or two. (DFOF at ¶ 43; PR at ¶ 43.) Despite Koeppel's impending transfer, Mandy persisted in her request for her own transfer to Hellman's department, apparently because she no longer wanted to work for Arndorfer. (DFOF at ¶¶ 42, 45; PR at ¶¶ 42, 45.) Consistent with her request, Mandy was transferred to Hellman's department the Monday after the January 17th meeting. (DFOF at ¶ 44; PR at ¶ 44.) The transfer was not a demotion and did not result in a change of pay.[2] (DFOF at ¶ 46; PR at ¶ 46.) Nevertheless, Mandy filed her administrative charge of sex discrimination on February 15, 1996. (PFOF at ¶ 55; DR at ¶ 55.)

**II**

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, an-

---

**2.** In her briefing on summary judgment, Mandy seems to suggest that her transfer to Hellman's department formed part of the harassment which she suffered on account of Koeppel. The Court might agree, if the transfer was necessary to escape Koeppel's conduct. Clearly, that was not the case. It was first decided that Koeppel would be transferred, and based on that decision Mandy was asked if she would like to stay at her current position. Mandy's decision to transfer anyway cannot be reasonably attributable to Koeppel's actions.

swers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Summary judgment is no longer a disfavored remedy. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.,* at 327, 106 S.Ct. 2548. It "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." *United Food and Commercial Workers Union Local No. 88 v. Middendorf Meat Co.,* 794 F.Supp. 328, 330 (E.D.Mo.1992). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). While a *material* fact is one that is "outcome determinative under the governing law", *Whetstine v. Gates Rubber Co.,* 895 F.2d 388, 392 (7th Cir.1990), a *genuine* issue as to that fact is raised only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

The question whether a material issue of fact is *genuine* necessarily requires "some quantitative determination of sufficiency of the evidence." Childress, *A New Era for Summary Judgments: Recent Shifts at the Supreme Court,* 116 F.R.D. 183, 186 (1987). "Of course, a court still cannot resolve factual disputes that could go to a jury at trial, ... [b]ut no longer need the trial court leave every sufficiency issue for trial or a later directed verdict motion." *Id.* "A district judge faced with [a summary judgment motion] must decide, subject of course to plenary appellate review, whether the state of the evidence is such that, if the case were tried tomorrow, the plaintiff would have a fair chance of obtaining a verdict." If not, the motion should be granted and the case dismissed. *Palucki v. Sears, Roebuck & Co.,* 879 F.2d 1568, 1572–73 (7th Cir.1989) (citations omitted). Thus, a party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corporation,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[A] party must produce 'specific facts showing that there remains a genuine issue for trial' and evidence 'significantly probative' as to any [material] fact claimed to be disputed." *Branson v. Price River Coal Company,* 853 F.2d 768, 771–72 (10th Cir.1988). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505. Nor may "[a] party to a lawsuit ... ward off summary judgment with an affidavit or deposition based on rumor or conjecture. 'Supporting and opposing affidavits shall be made on personal knowledge, ....'" *Palucki,* 879 F.2d at 1572 (7th Cir.1989). Such principles insure that summary judgment is utilized "when it can be shown that a trial would serve no useful purpose." *Windham v. Wyeth Laboratories, Inc.,* 786 F.Supp. 607, 610 (S.D.Miss.1992).

## III

█] It is perhaps appropriate to first note that the Court, in granting summary judgment to Quad in this matter, does not

conclude or imply that Mandy was not the victim of sexual harassment at the hands of her supervisor, Vince Koeppel. While Koeppel denies many of Mandy's allegations, the Court resolves those disputes in Mandy's favor for purposes of summary judgment. Moreover, under 7th Circuit precedent, "[h]arassment need not be linked to an economic *quid pro quo;* rather, it encompasses all forms of conduct that unreasonably interfere with an individual's work performance or create an intimidating, hostile, or offensive working environment." *McKenzie v. Illinois Department of Transportation.* 92 F.3d 473, 479 (7th Cir.1996). In the latter cases, the harassment at issue "must be sufficiently severe or pervasive so as to alter the conditions of the victim's employment and create an abusive working atmosphere." *Id.* Because this approach "is not susceptible to a 'mathematically precise' test," courts must consider several factors, including "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, and whether it unreasonably interferes with the worker's performance." *Id.* at 479–80. Here, if Mandy's allegations are true (and the Court assumes they are for purposes of this motion), she was certainly the victim of a hostile working environment created by Koeppel. Koeppel's actions were boorish, humiliating, inexcusable and unrelenting, and the Court empathizes with Mandy and any man or woman who is abused in this fashion. However, Vince Koeppel's liability is not at issue here. Rather, the question is whether Quad can be held vicariously liable for Koeppel's actions. In answering that question, the Court assumes that Mandy was the victim of sexual harassment by means of a hostile work environment created by her immediate supervisor.

Two recent decisions from the Supreme Court of the United States—*Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) and *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)—clarify the standards governing an employer's liability under Title VII for a supervisor's sexual harassment of a subordinate. Prior to these decisions, most federal courts analyzed vicarious liability according to the type of harassment alleged. In cases of so-called *quid pro quo* sexual harassment—where a supervisor threatens an employee with tangible job action (*i.e.,* termination, demotion, denial of raise or promotion, etc.) if the employee refuses to submit to the supervisor's sexual demands, and the supervisor subsequently carries out the threat—federal courts held the employer vicariously liable, regardless of whether the employer was aware of the conduct at issue or took measures to prevent such conduct. *Burlington,* 118 S.Ct. at 2264. In cases involving a so-called *hostile working environment*—where, as indicated above, a supervisor visits certain bothersome attentions and/or unwelcome sexual overtures upon an employee to such a severe or pervasive degree that it alters the conditions of the victim's employment and creates an abusive working environment—many federal courts, including the 7th Circuit, held the employer vicariously liable only if it was negligent in discovering or remedying the alleged harassment. *See e.g., Perry v. Harris Chernin, Inc.,* 126 F.3d 1010, 1013 (7th Cir.1997) (and cases cited therein); *see also, Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 675–76 (10th Cir.1998); *Knabe v. Boury Corp.,* 114 F.3d 407, 411–12 (3rd Cir.1997). In *Burlington,* the Supreme Court noted that the difference in treatment encouraged many plaintiffs to state their claims as *quid pro quo* claims, "which in turn put expansive pressure on the definition" of *quid pro quo* harassment. *Burlington,* 118 S.Ct. at 2265. To alleviate this pressure, *Burlington* and *Faragher* explained that the terms *quid pro quo* and *hostile work environment* are used primarily "to instruct that Title VII is violated by either explicit or constructive alterations in the terms or conditions of employment and to explain the latter must be severe or pervasive." *Burlington,* 118 S.Ct. at 2264. They are not intended to "bear[ ] upon an employ-

er's liability for an employee's discrimination." *Id.* The latter issue, according to the Supreme Court, turns on "principles of agency law," considered both generally and within the context of Title VII's underlying policy of deterrence.

■ Under general agency principles, there are several grounds upon which an employer may be held vicariously liable for sexual harassment by one of its supervisors, but not all grounds apply in every case. For example, where the conduct of the abusive supervisor falls within the scope of the supervisor's employment, liability will attach. *Id.* at 2266–67. However, sexual harassment does not fall within the scope of employment unless it was motivated by a purpose to serve the employer. *Id.* Because most instances of sexual harassment are not meant to serve the employer's interests, but rather involve personal motives often antithetical to the same, "[t]he general rule is that sexual harassment by a supervisor is not conduct within the scope of employment." *Id.* Here, Mandy makes no claim, and certainly provides no evidence, that Koeppel's actions were motivated by a desire to serve Quad's interests. To the contrary, Koeppel appears to have been motivated by his own sexual desires and/or a need to exercise some form of psychological control over Mandy. The same is not a basis for employer liability.

Even where sexual harassment occurs outside the scope of employment, there are "limited circumstances" in which an employer will be liable. *Burlington,* 118 S.Ct. at 2267. These circumstances are set forth in the Restatement (2d) of Agency (1957) § 219(2):

(a) the [employer] intended the conduct or the consequences, or

(b) the [employer] was negligent or reckless, or

(c) the conduct violated a non-delegable duty of the [employer], or

(d) the [supervisor] purported to act or speak on behalf of the [employer] and there was reliance upon apparent authority, or he was aided in accomplishing

the [harassment] by the existence of the agency relation.

*Burlington,* 118 S.Ct. at 2267. "Subsection (a) addresses direct liability, where the employer acts with tortious intent, and indirect liability, where the agent's high rank in the company makes him or her the employer's alter ego." *Id.* Mandy does not claim that Quad management intended Koeppel to treat her in this manner. Indeed, given Quad's strict anti-harassment policy and victim-friendly reporting procedures, no reasonable person could reach such a conclusion. Nor was Koeppel's rank at Quad sufficient to impute liability to the Company, and Mandy does not contend there were any non-delegable duties involved. Accordingly, liability does not lie under subsections (a) and (c). *See id.*

"Under subsection (b), an employer is liable when the tort is attributable to the employer's own negligence." *Id.* "An employer is negligent with respect to sexual harassment if it knew or should have known about the conduct and failed to stop it." *Id.* Mandy makes no showing or claim that Quad was aware of Koeppel's actions prior to Mandy's complaints. While there is evidence that Quad personnel were aware that Koeppel was a difficult person to work with, it was thought that Koeppel's difficulties extended to both men and women. Moreover, there is no evidence that Koeppel was the subject of prior complaints by other women alleging sexual harassment. While Mandy takes issue with the manner in which Quad responded once she formally complained of Koeppel's behavior, *Burlington* analyzed such a theory of liability under the "aided in the agency relation standard" found in subsection (d) of the Restatement, and not under the negligence prong of subsection (b). *See id.* at 2267–70.

Moving on to subsection (d), the same gives rise to vicarious liability when the supervisor at issue "uses apparent authority" or when the supervisor "was aided in accomplishing the tort by the existence of the agency relation." *Id.* at 2267. "As a

general rule, apparent authority is relevant where the agent purports to exercise a power which he or she does not have." *Id.* at 2267–68. "In the usual case, a supervisor's harassment involves misuse of actual power, not the false impression of its existence." *Id.* at 2268. Even where it is alleged that a victim of harassment had "a false impression that the actor was a supervisor, when he in fact was not, the victim's mistaken conclusion must be a reasonable one."[3] *Id.* Here, there is no question that Koeppel was Mandy's direct supervisor. Therefore, Mandy's case involves the misuse of actual power, not a false impression of the same. As stated in *Burlington,* "[w]hen a party seeks to impose vicarious liability based on an agent's misuse of delegated authority, the Restatement's aided in the agency relation rule, rather than the apparent authority rule, appears to be the appropriate form of analysis." *Id.*

Which finally brings us to the meat of this case. In *Burlington,* the Supreme Court noted that, while most workplace tortfeasors are aided in their torts by the existence of the agency relation, the *aided in the agency relation* standard "requires the existence of something more than the employment relation itself." *Id.* The requirement for "something more" is clearly met in so-called *quid pro quo* cases, where "a supervisor takes a tangible employment action against the subordinate" who refuses his sexual overtures. *Id.* "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* When a supervisor takes such actions, "there is assurance the injury could not have been inflicted absent the agency relation." *Id.* at 2269. Indeed, such actions "are the means by which the supervisor brings the official power of the enterprise to bear on subor-

dinates." *Id.* Here, Mandy admits that Koeppel never took any tangible employment action against her. While he threatened to fire her at times, he never followed through on those threats. In fact, Koeppel promoted Mandy to a prestigious position within Cover Concepts, and she received several pay raises while working for Koeppel.

The foregoing admission makes Mandy's case a bit more difficult. That is, "[w]hether the agency relation aids in commission of supervisor harassment which does not culminate in a tangible employment action is less obvious." *Id.* For example, in one sense the harassing supervisor is always aided by the agency relation, because his power and authority as a supervisor "invests his ... harassing conduct with a particular threatening character,...." *Id.* At the same time, a supervisor's offensive conduct may consist of acts which a non-supervisor could also commit, such that one's supervisor status makes little difference. *Id.* Where is the line to be drawn? To help clarify matters, the Supreme Court turned to the policies underlying Title VII. Specifically, the Court noted that "Title VII is designed to encourage the creation of antiharassment policies and effective grievance mechanisms" so as to deter continuing and future harassment in the workplace. *Id.* at 2270. Consistent with this policy, employer liability under the *aided in the agency relation* standard should "depend in part on an employer's effort to create such [policies and] procedures,...." *Id.* Equally consistent, such liability should be limited in a way that "encourage[s] employees to report harassing conduct before it becomes severe or pervasive,...." *Id.* Thus, in an effort to give effect to these considerations, and to provide a relatively clear and workable framework for future courts considering these issues, the Supreme Court issued the following ruling for cases

---

**3.** The Court presumes the victim's mistake must also be attributable to the employer. That is, if an abuser creates the illusion of authority by his own actions, actions which are unknown, unaided and unratified by the employer, it would seem unreasonable to hold the employer liable on the basis of apparent authority.

analyzed under the *aided in the agency relation* standard:

> In order to accommodate the agency principles of vicarious liability for harm caused by misuse of supervisory authority, as well as Title VII's equally basic policies of encouraging forethought by employers and saving action by objecting employees, we adopt the following holding in this case and in *Faragher v. Boca Raton*, .... An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, .... The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing any unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense. No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

*Id.*

### IV

█ Applying the foregoing to the facts of this case, it is clear that Quad prevails on its *Burlington* defense as a matter of law. First, there is no dispute that, at all relevant times, Quad had in place a formal, written anti-harassment policy—detailed *supra*—that prohibited conduct like Koeppel's in clear and forceful terms. Moreover, it is undisputed that Quad's written policy included a formal procedure for reporting complaints of sexual harassment. That policy promised a prompt investigation of such complaints and stated that the complaining employee's position or opportunities for advancement would not be jeopardized as a result of her complaint. The policy also made clear that retaliation against a complaining employee would not be condoned, and it allowed an employee to report the matter to the Director of Employee Services if the employee's direct supervisor was the perpetrator of the harassment. Finally, it is undisputed that these policies and procedures were set forth in the Company's employee manual, and that Mandy received and read the same when she started working for Quad. Under these facts, no reasonable person could conclude that Quad failed to exercise reasonable care in preventing Koeppel's sexual harassment of Mandy.[4]

█ The same can be said for Quad's actions to correct Koeppel's behavior once Mandy lodged a formal complaint. While *Burlington* did not set forth specific guidelines for determining when corrective action satisfies the threshold of "reasonable care," prior decisions from the 7th Circuit and other appellate courts state that "[a]n employer's response to alleged instances of employee harassment must be reasonably

---

4. This conclusion might be weakened if there were evidence that Koeppel was the subject of prior complaints, formal or informal, by other women alleging sexual harassment, but no such evidence exists in the record.

calculated to prevent future harassment under the particular facts and circumstances of the case at the time the allegations are made." *McKenzie*, 92 F.3d at 480 (citing *Brooms v. Regal Tube Co.*, 881 F.2d 412, 421 (7th Cir.1989)); *see also, Adler*, 144 F.3d at 676; *Ellison v. Brady*, 924 F.2d 872, 881–82 (9th Cir.1991); *Katz v. Dole*, 709 F.2d 251, 256 (4th Cir.1983). Just what is reasonable "rests in part on the gravity of the harassment and, in part, on the sufficiency of the information made available by the employee." *Marsicano v. American Society of Safety Engineers*, 1998 WL 603128 *6 (N.D.Ill.1998) (citing, *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1015 (7th Cir.1997) and *Baskerville v. Culligan International Co.*, 50 F.3d 428, 432 (7th Cir.1995)). It also rests on the results which follow. Clearly, "[a] stoppage of harassment shows effectiveness, which in turn evidences ... reasonable calculation." *Adler*, 144 F.3d at 676. However, a complete halt to harassment is not always necessary. Indeed, "it is possible that an action that proves to be ineffective in stopping the harassment may nevertheless be ... reasonably calculated to prevent future harassment and therefore adequate." *Knabe*, 114 F.3d at 411 n. 8; *see also, Adler*, 144 F.3d at 676 ("Because there is no strict liability and an employer must only respond reasonably, a response may be so calculated even though the perpetrator might persist *** a victim may have to suffer repeated harassment while an employer progressively disciplines the perpetrator to determine whether he or she is just such a 'hard case.' "). An alternative rule would require employers to take the most severe action in every case, which would no doubt expose these same employers to lawsuits from the other direction. *Adler*, 144 F.3d at 677.

Here, it is clear that Quad acted promptly and reasonably in responding to Mandy's complaint. That same day, Ko-

eppel was confronted with Mandy's allegations and ordered not to have any further contact with her. An investigation immediately ensued. The investigation was thorough, involving interviews of several potential witnesses, including Mandy and Koeppel. Within days a formal report was prepared, which concluded that Mandy was sexually harassed by Koeppel. While the harassment at issue was relatively severe, so were the corrective and disciplinary measures taken against Koeppel. It is undisputed that Koeppel was chewed out by Frank Arndorfer, Quad's Vice–President of Finishing. Koeppel was warned that his conduct was unacceptable, that he was not to have any further contact with Mandy, and that any further incidents would lead to dismissal. Koeppel was also warned not to do or say anything that could be viewed as hostile or retaliatory towards Mandy.[5] He was moved to a work area in another building 200 to 300 yards away from Mandy's building. More significantly, Koeppel was stripped of all supervisory responsibility over any Quad employees, including Mandy, and Mandy herself admits that this was one of the harshest forms of discipline a manager could receive. To top it off, Koeppel was punished financially: His pay was frozen, his bonus was reduced, and he was denied a subsequent wage increase. On these facts, the Court is at a loss as to how Mandy and her counsel can refer to such measures as "nothing more than a proverbial slap on the wrist." (Plaintiff's Brief in Opposition at 33.) To the contrary, they were stiff penalties which were reasonably calculated to alter Koeppel's conduct, particularly when one considers that Mandy's was the first and only reported incident of sexual harassment against Koeppel. What is more, the measures worked. The specific types of harassment which Mandy complained of ceased as of the day she

---

5. Mandy makes much of the fact that none of these warnings or reprimands were put in writing and placed in Koeppel's personnel file. However, there is nothing magical about putting such things in writing. There is little reason to think that written warnings and reprimands will have a more deterrent effect than their oral counterparts, particularly in cases like this, where additional, punitive measures are taken to get the point across.

first reported Koeppel's conduct to Quad management.

Of course, Mandy complains that she still had to see Koeppel at work, perhaps daily, but these sightings did not involve direct conversation or physical contact. Moreover, while the mere presence of an employee who has engaged in particularly severe or pervasive harassment can, in some cases, create a hostile working environment—see, *Ellison*, 924 F.2d at 883— the evidence does not suggest that this is such a case. First, when Mandy reported the allegations to Quad management, she was asked what she would need to feel safe in the workplace. Mandy said nothing at the time about transferring Koeppel out of the Sussex facility; indeed, she specifically stated that she did not want Koeppel to get into trouble or lose his job, and asked only that the harassment stop, that she be left alone to do her job in peace, and that she not have to worry about Koeppel firing her.[6] Second, despite the ready availability of a procedure for safely reporting Koeppel's conduct to Quad management, Mandy waited almost two years before making a formal complaint. During this time Mandy was able to work closely with Koeppel, despite the harassment, and to succeed in her work, receiving a promotion and several raises. Such evidence indicates that Koeppel's actions—while unwelcome, annoying and ultimately harassing— were not so severe that his mere presence created a hostile work environment for Mandy. At the very least, no reasonable person could conclude that Quad—faced with Mandy's initial wishes that Koeppel not be punished and her failure to come forward sooner—should have realized that Koeppel's mere and occasional presence in Mandy's work area was intolerable.

Mandy also complains that Koeppel continued to harass her; specifically, that he walked down her work aisle on several occasions to interrupt conversations she was having with other employees. Of course, by itself, such conduct does not create a hostile work environment. Even when considered in the context of Koeppel's prior conduct, the alleged actions are certainly open to innocent interpretations. But this is summary judgment, and the Court views the facts in a light most favorable to Mandy. For that reason, the Court assumes that Koeppel interrupted Mandy's conversations with these employees in order to register a silent protest and retaliate against her. Even so, as indicated *supra*, the fact that an abusive supervisor persists in his conduct does not render an employer's corrective measures unreasonable. Indeed, where the subsequent conduct pales in comparison to the conduct which prompted the corrective measures— which is clearly the case here—the only reasonable conclusion is that the measures were largely effective and therefore reasonably calculated to prevent future harassment. Moreover, as also indicated *supra*, if an employer takes progressively stiffer measures once an abusive supervisor renews his harassment, it will not be vicariously liable for the supervisor's conduct. That is precisely what happened here. Quad initially took very stiff measures, albeit short of a complete transfer, which served to bring a halt to the various forms of harassment Koeppel visited upon Mandy prior to her complaint. When Mandy complained of renewed harassment—conduct far less severe than that originally reported—the Company took the next step and transferred Koeppel out of the Sussex facility entirely. On these facts, no reasonable jury could conclude

**6.** It was not until eight days later, when Arndorfer met with Mandy to inform her of the actions he was taking against Koeppel, that Mandy expressed her desire that he be transferred out of the Sussex facility. Arndorfer remembers this conversation a little differently, but the Court accepts Mandy's version for purposes of summary judgment. Also, the investigative report compiled by Quad's staff attorney recommended that Koeppel be transferred out of the Sussex facility, but this recommendation was not based on a belief that Koeppel's mere presence created a hostile work environment. Rather, the action was only "one way" of ensuring that Koeppel had no further contact with Mandy.

that Quad did not act reasonably and promptly to correct Koeppel's past harassment and prevent any future harassment.

■] Finally, it is clear that Mandy unreasonably failed to take advantage of the preventive and corrective opportunities provided by Quad's anti-harassment policy and procedures. As stated earlier, Mandy delayed almost two years before reporting Koeppel's conduct to Quad management. Had she reported this conduct immediately, or at least much sooner, a great deal of the harassment could have been avoided, as indicated by the manner in which the harassment ceased, almost completely, once Mandy reported the same in November, 1995. Mandy first explains her delay by noting that she was afraid of retaliation by Koeppel, but Quad's anti-harassment policies and procedures—which ensure confidentiality and protect an employee from retaliation—should have reasonably allayed her fears. Mandy also argues that sexual harassment—particularly harassment involving a hostile working environment—is not always immediately apparent to its victim. Indeed, precisely because a hostile working environment tends to be comprised of acts spread over time—acts which, by themselves, may not seem all that offensive—an employee typically has to take a wait-and-see approach before reaching a conclusion that he or she is being harassed. The Court certainly agrees with these propositions as a general matter. But as indicated in *Burlington,* the employee's duty in this regard is to report harassing conduct "before it becomes severe or pervasive, . . . ." *Burlington,* 118 S.Ct. at 2270. Moreover, at some point, the ship leaves the port. Koeppel's harassment began immediately in December, 1993 and continued until November, 1995. It quickly assumed a sexual nature, involving crude comments about Mandy's physical features and certain suggestive physical contact. Mandy reacted immediately, consistently telling Koeppel that such conduct bothered her and that he should back off. Moreover, throughout 1994 and 1995, Mandy claims Koeppel would call her or visit her at home for reasons unrelated to work, or watch her at home without her knowledge, despite admonitions against such intrusions. If that was not enough to trigger Mandy's duty to come forward (and the Court thinks it was), Mandy certainly knew she was the victim of a hostile work environment when Koeppel started inviting her to private "Think Smalls" for overtly sexual purposes, and then called her at home to tell her he was masturbating. Such actions, which allegedly occurred as early as 1994, could not be misinterpreted. Mandy should have come forward much sooner than she did, and her failure to do so completes Quad's *Burlington* defense.[7]

## V

In conclusion, Kari Mandy has come forward with substantial evidence that she was sexually harassed by Vince Koeppel. She has not, however, come forward with sufficient evidence to allow a reasonable jury to conclude that Quad/Graphics is vicariously liable for Koeppel's actions. While such a result may sound like crime without punishment, it is important to remember that the "primary objective" of Title VII "is not to provide redress but to avoid harm." *Faragher,* 118 S.Ct. at 2292. Had Mandy reported the problem sooner, much harm could have been avoided. Once Mandy finally came forward, Quad took quick and effective action to stop Koeppel's conduct. That is all Title VII asks.

7. In addition to the *Burlington* defense, Quad argues that Mandy's delay in coming forward places much of Koeppel's alleged conduct outside the 300–day statute of limitations applicable to Title VII actions. Putting aside this stale conduct, Quad argues that the remaining conduct does not rise to the level of a hostile working environment. The Court need not decide this issue, because even if one factors the stale conduct into the mix, and concludes that such conduct amounts to actionable harassment, Quad prevails on a *Burlington* defense.

NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:

1. Defendant's motion for summary judgment is granted and the case dismissed.

**SO ORDERED,**